UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| MARYANN SOLARI, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )   Civil No. 19-11475-LTS |
| | ) |
| PARTNERS HEALTHCARE SYSTEM, | ) |
| INC., and PARTNERS HEALTHCARE | ) |
| SYSTEM, INC. LONG-TERM | ) |
| DISABILITY PLAN, | ) |
| | ) |
| Defendants. | ) |
| | ) |

MEMORANDUM AND ORDER ON
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT (DOC. NO. 34) AND
DEFENDANTS' CROSS MOTION FOR SUMMARY JUDGMENT (DOC. NO. 39)

March 22, 2021

SOROKIN, J.

        Plaintiff MaryAnn Solari brings this action against Defendants Partners Healthcare

System, Inc and Partners Healthcare System Inc. Long-Term Disability Plan pursuant to the

Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1132(a)(1)(B).

Solari seeks reinstatement of her long-term disability (LTD) benefits. The parties have cross

moved for summary judgment. Doc. Nos. 34 & 39. For the reasons which follow, Solari's

Motion for Summary Judgment (Doc. No. 34) and Partners' Cross Motion for Summary

Judgment (Doc. No. 39) are ALLOWED IN PART, DENIED IN PART, and RESERVED IN

PART as detailed herein.

I.        BACKGROUND

Solari has been diagnosed with postural orthostatic tachycardia syndrome (POTS),[1] a condition affecting her circulation, and mast cell activation syndrome (MCAS),[2] a condition which causes her to experience episodes of anaphylaxis if left untreated. She reports constant fatigue and difficulty standing too long. She also reports episodes of sudden onset tachycardia (racing heartrate) which, when they strike, leave her nauseous and unable to stand or sit. Partners stopped Solari's LTD benefits after concluding the evidence supporting Solari's diagnoses was borderline and that her self-reported symptoms were not supported by objective medical evidence.

A. <u>Solari's Medical History</u>

1. *Initial Diagnosis*

Solari, who is now in her late forties, worked as a nurse for thirteen years before stepping down due to ill health. AR0155; AR0600; AR0157. In the fall of 2009, she reported symptoms of flushing, chest heaviness, and fatigue. AR0497. Over the next few months, she reported worsening symptoms including throat tightening, profound fatigue, diarrhea, tachycardia, sweating, lightheadedness, and heaviness in her left arm. <u>Id.</u> She rapidly lost fifteen pounds in weight and suffered daily intermittent fevers between 99 and 101 degrees. <u>Id.</u>; <u>see also</u> AR0503 (confirming fever during exam); AR0543 (same); <u>but see</u> AR0522 (no fever upon exam); AR0531 (same).

---

[1] POTS is a "clinical syndrome" whereby "the body's autonomic nervous system fails to compensate for upright posture." <u>Balasco v. Sec'y of Health and Human Servs.</u>, No. 17-215V, 2020 WL 1240917, at *17 (Fed. Cl. Feb. 14, 2020).

[2] MCAS symptoms include "[f]lushing, dizziness, headache, throat swelling, fatigue, acute abdominal attacks of terrible burning pain/cramping, shaking/tremulousness, lightheadedness, [and] memory impairment." <u>Hirshon v. Commissioner, Soc. Sec. Admin.</u>, 2018 WL 1093877, at *7 (D. Or. 2018).

Solari's primary care doctor, Dr. Carol Ehrlich of Massachusetts General Hospital, referred Solari to specialists in gastroenterology, infectious diseases, rheumatology, allergy, and cardiology for aid in diagnosing her symptoms. AR0497. As part of this work up, Solari was given autonomic testing at the direction of a neurologist. AR0763. During the tilt table portion of the exam, Solari's heartrate response approached criteria for postural tachycardia, and she experienced exaggerated postural tachycardia in the active stand phase of the test. AR0763. The neurologist concluded Solari's responses were abnormal and were evidence of exaggerated POTS, which he noted was "associated with a mild or early autonomic neuropathy, neuropathy that involves the distal vasculature sparing the cardiac innervation, cardiovascular deconditioning, cardiac beta adrenoreceptor, super sensitivity, mitral valve prolapse, fever, [and] volume depletion." AR0763–64. Dr. Alexandra Hovaguimian, Solari's neurophysiologist, agreed the results were significant for POTS and Solari was ordered to increase her salt intake, enter into a structured exercise plan, and begin taking several medications. AR0761. With treatment, Solari rapidly began to regain the weight she had lost. AR0995.

On March 24, 2011, Solari was seen by Dr. Norton Greenberger, a gastroenterologist, to confirm a suspected diagnosis of MCAS. AR0872. Dr. Greenberger found that Solari had "virtually all" of the symptoms associated with MCAS, ordered a urinary analysis, and began her on a course of treatment. Id. Although Solari's urinary results came back negative, Dr. Greenberger noted that this was not uncommon for patients suffering with MCAS and confirmed his diagnosis of MCAS when Solari reported significant improvement following treatment. AR0873–75; AR0879.[3] Dr. Greenberger also expressed concern that Solari's reported fatigue

---

[3] Later testing appears to have supported Dr. Greenberger's initial diagnosis. AR0288.

may be due to rapid weight gain, which he partly attributed to the high levels of salt she was ingesting. AR0877.

    2.  *Continuing Treatment*

In a report dated July 13, 2011, Dr. Hovaguimian described how Solari was reacting to treatment for MCAS and POTS. She wrote: "[Solari] has been doing somewhat better since initiating [treatment for MCAS]. Her fevers and flushing have improved. Over the last few weeks, however, she continues to have worsening of overall fatigue." AR0927. Solari also reported to Dr. Hovaguimian that her racing-heartrate symptoms had largely disappeared after beginning to take a drug called propranolol, but that she still experienced significant variations in heartrate when changing from a supine to standing position. Id.; see also AR0713; AR0998; AR1185 (noting Solari was later weaned off propranolol). Solari reported feeling a "chest weight" when particularly fatigued and also reported that she remained unable to exercise. AR0925.

Dr. Hovaguimian met with Solari again in 2013 for a follow up visit. She documented that Solari was continuing to feel generalized fatigue and significant postural lightheadedness, though she noted that the latter was "not a big problem for her." AR1634; AR1636. Solari also reported that she had largely ceased exercising and she speculated that her resulting weight gain may be contributing to her symptoms. Id. Dr. Hovaguimian noted in her report that she was uncertain to what extent Solari's symptoms were caused by POTS but concluded it was likely a contributing factor. AR1636.

Solari further discussed her symptoms with Dr. Hovaguimian in a follow up visit in 2014. AR1638. Solari explained that she was still experiencing persistent fatigue and that, while she remained "very involved" in her children's activities, such involvement left her feeling drained.

Id.; see also AR1847 (Solari reporting to another healthcare provider that she experienced "days of full body fatigue" following exercise). Solari reported that she had adopted a light exercise regime, biking for roughly fifteen minutes, and stated that she did not develop any tachycardia or dyspnea when exercising. Id.[4]

Concerned by Solari's weight gain and fatigue, Dr. Hovaguimian enrolled Solari in late 2014 in a cardiovascular rehabilitation clinic, in which Solari engaged in carefully monitored exercise activities. AR1856; AR1902. A report prepared after Solari's first fifteen weeks describes her progress using metabolic equivalent of task ("MET") units, which are a standardized measure of the intensity of an activity or exercise. The report documents that Solari began the program able to exercise at a METs level of 1.8 for twenty-five minutes and that after fifteen weeks she was able to exercise at 2.8 METS for forty minutes. AR1856. The report also documents Solari's cardiovascular data. This data shows Solari experienced elevated heartrate, usually between 110 and 130 beats per minute, during exercise. Otherwise, the report also notes that Solari's "hemodynamics were stable" and that she remained asymptomatic during her classes. Id. Solari reported to Dr. Hovaguimian that these classes left her feeling fatigued "but not markedly worse." AR1902.

Solari returned for further autonomic testing in 2013 and 2016. AR2053; AR2517. Unlike her first autonomic test, which revealed evidence of exaggerated POTS, these later tests were "borderline stud[ies] with a heartrate that approached criteria for postural tachycardia." AR2517 (emphasis added) (2016 study); see also AR2053 (2013 study documenting substantially similar

---

[4] A separate report prepared by a different physician in 2014 stated, in the medical history portion, that Solari also suffered from "intermittent palpitations and dizziness" and that these symptoms were "controlled by" certain medications she was on. AR1605. The report makes clear that it is merely restating prior medical notes rather than providing fresh observations. Id. It is unclear from the administrative record when these symptoms were actually recorded.

results). In a follow up report in 2016, Dr. Hovaguimian noted that Solari complained that her

fatigue had worsened "to the point where she had difficulty exerting herself." Id.

Solari visited Dr. Greenberger for a follow up regarding her MCAS in 2011 and 2012.

Dr. Greenberger's notes from these visits are brief, documenting that Solari continued to suffer

from fever, mental fog, and headaches. AR1331; AR1333. Solari reported similar symptoms to

Dr. Greenberger in 2013, stressing that she continued to suffer from severe fatigue. AR1432.

Solari returned again in 2017. AR2489. In speaking with Dr. Greenberger, Solari described her

fatigue as a seven on a ten-point scale and placed her mental fog at a five. AR2491. In response,

Dr. Greenberger ordered slight modifications to her daily medications and ordered a

colonoscopy, which revealed a normal mast cell distribution. AR2490.

In addition to the above-described medical visits, Solari continued to meet each year with

her primary care provider, Dr. Ehrlich, whose notes are brief but confirm that she was well

acquainted with Solari's medical progress and that she had developed a rapport with her patient.

See AR1844; AR2268; AR2457. In 2017, Dr. Ehrlich documented that Solari's POTS presented

"[o]ngoing issues that she knows how to manage" and that her fatigue similarly presented

"[o]ngoing issues in terms of [her] weakness and fatigue." AR2463. Ehrlich continued: "By the

end of the day of taking her daughter's [sic] to dance and doing the general work of the house

she has a lot of fatigue and has trouble with the following day." Id.

B.  The LTD Policy

As part of her compensation while working for Partners, Solari was provided with

coverage under a self-funded LTD plan. The administrative record contains summary plan

documents but not the actual written plan. See Doc. No. 47. It does however contain a "Long

Term Disabilities Plan booklet," issued on July 2, 2009, along with two Summary Plan

Descriptions ("SPDs") issued in 2018 and 2019. AR0002. Partners represents that no formal written plan document exists and that these summary descriptions constitute the written plan document within the meaning of ERISA. AR0002; AR0004; Doc. No. 42 ¶ 2–4.

The 2009 booklet provides that participants in the plan are eligible to receive a regular monthly LTD benefit payment under the policy should they become "Disabled." AR0016. The booklet goes on to define "Disabled" to mean, as relevant here, "unable to perform, with reasonable continuity, all of the material and substantial duties of your own or any other occupation for which you are or become reasonably fitted by training, education, experience, age and physical and mental capacity." AR0009.[5] The plan further provides that monthly payments will be discontinued should a participant cease to be Disabled. AR0020.

C. Solari's LTD Benefits Claim and Social Security Determination

1. *Solari's Initial Claim for LTD Benefits and Social Security Insurance Benefits*

With the support of Dr. Ehrlich, Solari left work and subsequently filed a claim for LTD benefits in 2010. AR0168; see also AR1098 (letter from Dr. Greenberger to Partners in 2012 supporting Solari's claim). The request was approved by Unum Life Insurance Company of America, the plan's claims administrator. AR0182–85; AR1033.

Solari then applied to the Social Security Administration for disability insurance benefits in 2012. After a hearing, an Administrative Law Judge found that Solari's reported symptoms could reasonably be caused by her diagnosed conditions but held that Solari's description of the severity of her fatigue was "not entirely credible," given the available medical evidence and Solari's self-reported household activities. AR1475. Consequently, Solari's claim was denied

---

[5] The 2018 SPD uses slightly different wording to define "Disabled." The language is substantively identical to that reproduced above, AR0042, and neither party has suggested the differences are material.

upon a finding that she retained sufficient residual functional capacity to perform light work, subject to certain physical limitations. AR1474.

Consistent with its role as claims administrator, Unum continued to monitor Solari's progress from 2010 to 2017. To this end, Unum regularly contacted Dr. Ehrlich and Dr. Greenberger to determine whether there had been any change in Solari's condition. On each occasion, the two physicians responded that Solari's condition had not improved and that she was unable to return to work. AR1099; AR1111; AR1429; AR1536; AR1540; AR1541; AR1744; AR1839; AR2040; AR2487; AR2500. Unum's representatives also occasionally spoke with Solari about her disability. She reported to them in 2012 that she was able to engage in light household chores, such as laundry and occasional cooking (one to two times per week) and was able to drive short distances without difficulty. AR1354; AR1393; 1665. In 2014, she reported that she volunteered for one hour a week at her daughter's school, but that she occasionally missed this commitment due to her continuing fatigue. AR1567.

2. *The Initial Decision by Claims Administrator Unum to Terminate Solari's LTD Benefits*

Partners paid Solari's LTD benefits claim for roughly seven years until, in a letter dated October 16, 2017, Unum informed Solari that her benefit payments would soon cease. AR0187. Unum's first decision letter disclosed that it had asked two of its physicians to review her medical records, and that, based on this review, Unum had concluded that the work restrictions and limitations asserted by her treating physicians were "inconsistent with the medical evidence." AR0188. The letter noted that recent autonomic testing had shown only limited evidence of POTS. Unum also asserted no "treating provider ha[d] documented abnormal mental status findings" to support her complaints of fatigue. AR0189. Unum characterized Solari's MCAS symptoms as controlled and "minimal," emphasizing that Dr. Greenberger had not

ordered further testing or new forms of medication for quite some time. Id. Unum concluded, based on its review, that Solari was capable of full-time sedentary work and identified several potential nursing roles open to her. Id.

Solari appealed from this decision and submitted letters from Dr. Greenberger and Dr. Ehrlich rebuffing Unum's conclusion Solari was able to return to work. AR0193; AR0213; AR0214. The two letters, which are substantially identical, highlight the longstanding relationship these doctors had with Solari and describe as "not realistic" Unum's contention Solari could return to sedentary work. AR213. The doctors recognized Solari has her "good days" but asserted that her "more frequent 'bad days'" would render her an unreliable employee. Id. Solari also submitted affidavits from friends and family, attesting to the severity of her symptoms. AR0265 ("Just getting through a very slow, daily routine is a process for [Solari] and she requires various breaks as this disease makes her feel constantly fatigued . . . ."); AR0268 ("[Solari] still needs help and [my wife] comes over to help her cook, clean, wash clothes whenever [she] calls . . . ."); AR0273 (observing that sometimes even moderate walking leaves Solari "nauseous" and "barely able to stand"); see also AR0274; AR0278; AR0281.

       3.   *Following Internal Appeal, Claims Administrator Unum Upholds Denial of Solari's LTD Benefits Claim*

After review, Unum upheld its initial decision to cease benefits in a letter dated May 15, 2018. AR0287. In its second decision letter, Unum explained that a third consulting physician tasked with reviewing Solari's claim had also concluded that she was able to return to work. AR0288. The letter begins by discussing Solari's reports of fatigue, which it primarily attributes to her MCAS. AR0288–89. Unum's review found that the majority of Solari's MCAS symptoms had responded to treatment and that only the "predominant reported symptom of fatigue has remained." AR0288. Unum commented that a recent colonoscopy showed "normal distribution

and density of mast cells" and that Solari's symptoms were otherwise stable. Id. Turning to

Solari's POTS, Unum described the results of Solari's autonomic testing as "normal to mildly

positive." AR0290. Unum also noted Dr. Hovaguimian's 2015 comment that Solari's fatigue

exceeded the amount reasonably attributable to her POTS and that it might be partly attributable

to Solari's "weight gain and deconditioning." AR0289. After reviewing the record, Unum

concluded the "findings in [Solari's] medical records, the SSA determination that she had light

work capacity, and Ms. Solari's activities (involvement with her children's activities and primary

caretaker of her children and home) are inconsistent with a total loss of functional capacity for

sustained work activity." AR0292. Accordingly, Unum upheld its initial decision.

4. *Solari's Functional Capacity Evaluation*

After receiving Unum's second denial letter, Solari engaged an occupational therapist to

perform a Functional Capacity Evaluation ("FCE") of her ability to work in a sedentary role. The

examination was conducted over two days in July 2018. Doc. No. 42 ¶ 78. The first day of

functional capacity testing appears to have taken place on one of Solari's "good days." Although

the report notes that Solari experienced some level of discomfort during the examination, such as

a heightened heartrate during the walking portion, AR0311, the report also documents that Solari

was a "match" with nearly all of the criteria for sedentary employment, AR0320–21.

The second day of testing apparently took place on one of Solari's "bad days." Midway

through an assessment which involved only light physical activity, Solari's heartrate suddenly

increased rapidly from 90 beats per minute to 180 beats per minute, where it remained for

approximately one or two minutes. AR0313. After fifteen minutes of lying on the floor, Solari's

heartrate fell to 100 to122 beats per minute. Solari's heartrate returned to normal only after forty-

five minutes of lying prone. Id. Solari was then assisted to the bathroom by the occupational

therapist, who documented that her heartrate increased to 120 beats per minute during that brief walk. Id. Based on this evaluation, the occupational therapist concluded that Solari did not have the physical ability to fulfil a sedentary role. See id. ("Although Ms. Solari may be able to tolerate sedentary work activities for short periods of time, she is not consistently able to put in a full productive work day . . . ."). Solari included the results of the FCE, alongside other evidence, in her appeal to the plan sponsor, Partners.

       5.   *Solari's Final Appeal and Plan Sponsor Partners' Decision Upholding*
            *Unum's Denial*

Partners upheld Unum's decision in a letter dated March 7, 2019. AR0371. In this final decision letter, Partners explained it had engaged an independent physician, Dr. Stephanos Kales, to review Solari's medical records and that Dr. Kales had agreed with the reasoning set forth in Unum's second decision letter. AR0372. Partners pointed to the "borderline and scant" evidence supporting Solari's POTS and MCAS diagnoses and highlighted that no restrictions had been placed on her driving. AR0372. Partners also discounted Solari's "subjective reports" of symptoms, stating her records "consistently failed to document true fever, hypotension, or clinically significant . . . tachycardia." Id. Consequently, Partners concluded Solari's fatigue was "subjective in nature" and "attributable to [her] considerable weight gain and deconditioning." AR0372. Finally, Partners agreed with Unum that the 2013 Social Security determination and Solari's activities in the home supported a finding that she was not disabled. AR0373.

   D.  Procedural History

On July 5, 2019, Solari filed suit against Partners HealthCare System, Inc., Partners Healthcare System, Inc. Long-Term Disability Plan, Unum Life Insurance Company of America, and Unum Group alleging wrongful denial of benefits pursuant to ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B). Doc. No. 1. The parties jointly agreed to dismiss Unum Life and Unum

Group from the action on September 27, 2019. Doc. No. 19. On January 23, 2020, Solari moved

for discovery to expand the record, Doc. No. 25, which the Court denied after in camera review

of the proposed evidence, Doc. Nos. 29, 32.

Solari has moved for summary judgment on the administrative record as it stood before

Partners at the time of denial. Doc. No. 34. [6] Partners has opposed and cross moved for summary

judgment. Doc. No. 39. The motions are fully briefed, Doc. Nos. 35, 37, 41, 43, and the Court

has chosen to dispense with oral argument. The case is ripe for disposition.

II.     LEGAL STANDARD

    A.  What Standard Applies

The parties dispute what standard of review applies in this case. Generally speaking, the

standard of review in an ERISA case differs from review in an ordinary civil case, where

summary judgment serves as a procedural device to screen out cases that present no trial-worthy

issues. See Leahy v. Raytheon Co., 315 F.3d 11, 17 (1st Cir. 2002); Orndorf v. Paul Revere Life

Ins. Co., 404 F.3d 510, 517 (1st Cir. 2005); Bard v. Boston Shipping Ass'n, 471 F.3d 229, 235

(1st Cir. 2006); cf. Fed. R. Civ. P. 56. Because the focus of the court's review in an ERISA case

is the final administrative decision, "the district court sits more as an appellate tribunal than as a

trial court." Leahy, 315 F.3d at 18. "In the ERISA context, summary judgment is merely the

vehicle for deciding the case; the factual determination of eligibility for benefits is decided solely

on the administrative record, and the non-moving party is not entitled to the usual inferences in

its favor." Bard, 471 F.3d at 235 (citation and internal quotation marks omitted).

---

[6] After briefing on the motions for summary judgment had concluded, Solari moved for an
evidentiary hearing into Partner's failure to include the formal written plan document in the
administrative record. Doc. No. 44. The Court denied the motion both because it was untimely
without adequate showing of good cause and because Partners represented it possesses no such
document. Doc. No. 47.

In ERISA cases, an inquiring court must peruse the plan documents in order to determine the standard of judicial review applicable to an ERISA plan's denial of benefits. See Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989). A challenge to a denial of benefits must be reviewed de novo "unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." Id. Where the plan document grants the plan full discretionary authority, the decision is instead reviewed for abuse of discretion. See id. at 111; Colby v. Union Sec. Ins. Co. & Mgmt. Co. for Merrimack Anesthesia Assocs. LTD Plan, 705 F.3d 58, 61 (1st Cir. 2013). The parties dispute whether the Court ought to review Partners' decision under the de novo or abuse of discretion standard.

There is no formal written instrument or plan document in this case. Accepting as true Partners' assertion that the Summary Plan Descriptions[7] constitute the written plan, AR0002, the Court must decide which SPD to look to in determining the correct standard of review.

As background, Solari applied for, and was granted, LTD benefits by Unum in 2010. AR00183; AR0722. Her eligibility was reevaluated in October of 2017, when an initial decision was made that she was no longer qualified for LTD benefits. AR0187. Solari filed two unsuccessful appeals. Her first was an internal appeal to Unum, which was denied in May of 2018. AR0286. Her second appeal was to Partners and it was denied in March of 2019. AR0371.

There are three SPDs potentially governing the standard of review in this case. The first was issued before Solari applied for benefits, in July of 2009. AR0004. This SPD does not vest any discretion in the claim administrator or plan sponsor. Id.; see also Doc. No. 37 at 3 (Partners conceding this point in briefing). Two later SPDs, issued in July of 2018 and January of 2019, do

---

[7] For the purpose of simplicity, the Court uses Summary Plan Description to refer to the booklet issued in 2009 as well as the later SPDs issued in 2018 and 2019.

vest discretionary authority in Partners. AR0038; AR0060; AR0134. Both of these later SPDs were issued after the initial denial of Solari's benefit claim, during the administrative appeals process.

In one sense, which SPD governs is an easy question. The First Circuit has expressed its view that courts should disregard any plan amendments (or new SPDs) issued after the initial denial decision. In Estate of Jajuga v. Prudential Insurance Co. of America, 742 F. Supp. 2d 176 (D. Mass. 2010), Magistrate Judge Neiman held that a court must apply the standard of review in place when a plan participant's benefits were first denied and that a post-determination amendment to the plan document did not alter the applicable standard of review. The First Circuit expressly adopted this position on appeal, despite noting appellants had not challenged that portion of Judge Neiman's decision. Scibelli v. Prudential Ins. Co. of Am., 666 F.3d 32, 40 & n.6 (1st Cir. 2012) (quoting from and adopting Judge Neiman's conclusion that "post-[initial] decision amendment[s] [to the plan] would not shift the standard of review from de novo to abuse of discretion"). Applying this logic, the 2009 SPD (which does not grant deference) is the governing plan in this case.

Partners argues the Court should disregard Scibelli and hold, as some other courts have held, that the SPD in effect at the time the final decision was issued, after all administrative appeals have been exhausted, is the one which controls. Doc. No. 37 at 3 (citing Hackett v. Xerox Corp. Long–Term Disability Income Plan, 315 F.3d 771, 774 (7th Cir. 2003); Grosz–Salomon v. Paul Revere Life Ins. Co., 237 F.3d 1154, 1159 (9th Cir. 2001)). Partners further suggests, Doc. No. 37 at 4, that the logic of Scibelli was undermined by a decision of the United States Supreme Court, Heimeschoff v. Hartford Life & Accident Insurance Co., 571 U.S. 99, 102-110 (2013), which was issued the following year.

14

There are three problems with Partners' arguments.

First, this Court is not at liberty to disregard controlling First Circuit precedent, even if it does happen to believe that precedent has been undermined by a subsequent Supreme Court decision. See United States v. Moore-Bush, 963 F.3d 29, 37 (1st Cir. 2020) (reversing district court which, relying on recent Supreme Court decision, departed from circuit precedent) (quoting Thurston Motor Lines, Inc. v. Jordan K. Rand, Ltd., 460 U.S. 533, 535 (1983) (per curiam) ("Needless to say, only this Court may overrule one of its precedents.")). True, there is an argument the First Circuit's decision in Scibelli was not a true holding given the issue had not been raised on appeal, but the First Circuit's conclusion is nonetheless entitled to significant respect.

Second, the logic of Scibelli is not undermined by the Supreme Court's decision in Heimeschoff, which has little to say on the issue. In Heimeschoff, the Supreme Court held that a participant's cause of action under ERISA accrues, for statute of limitation period purposes, once a plan issues a final denial decision. Heimeschoff, 571 U.S. at 105. Partners attempts to tie Heimeschoff to the current question by highlighting that some circuit courts have suggested the plan in place at the point an ERISA action accrues should control in post-determination litigation. See, e.g., Hackett, 315 F.3d at 774. But it is not clear that Scibelli rests on this logic. Although the Scibelli Court did not pause to explain itself fully, Judge Neiman's reasoning in Jajuga, which the First Circuit appears to endorse, did not rely on when a participant's claim accrued in determining which plan applied. Rather, Judge Neiman reasoned that the plan in place when the initial benefit determination was made should control because the subsequent administrative appellate process "did no more than affirm that original denial." Jajuga, 742 F. Supp. 2d at 182. Heimeschoff does nothing to undermine Judge Neiman's reasoning.

Third, the circuit cases which Partners relies upon are distinguishable. The Seventh Circuit in <u>Hackett</u>, the Third Circuit in <u>Smathers</u>, and the Ninth Circuit in <u>Grosz-Salomon</u> were not faced with the question of whether a plan administrator or fiduciary may grant themselves greater deference during the administrative appellate process, after the initial determination had been made. Those cases only addressed plan amendments enacted prior to the initial benefit decision. <u>See Hackett</u>, 315 F.3d at 773–74; <u>Smathers v. Multi-Tool, Inc./Multi-Plastics, Inc. Emp. Health & Welfare Plan</u>, 298 F.3d 191, 195 (3rd Cir. 2002); <u>Gross-Salomon</u>, 237 F.3d at 1158–60. Partners is correct that some district courts in those circuits have extended the above cited precedents and concluded that the plan in place upon final denial determines the standard of review. <u>See Borich v. Life Ins. Co. of N. Am.</u>, No. 12 C 734, 2013 WL 1788478, at *2 (N.D. Ill. Apr. 25, 2013); <u>Murray v. Anderson Bjornstad Kane Jacobs, Inc.</u>, No. C10-484 RSL, 2011 WL 617384, at *4 (W.D. Wash. Feb. 10, 2011). But whether or not those district courts correctly interpreted the precedents of the circuit court under which they sit, this Court is bound by the First Circuit's view which, as noted above, is clear. Nor is the First Circuit an outlier on this issue—at least one other circuit court (the Second) holds that later plan amendments cannot change the standard of review (albeit through different reasoning). <u>See Gibbs ex rel. Estate of Gibbs v. CIGNA Corp.</u>, 440 F.3d 571, 577 (2d Cir. 2006) (holding plan in place when disability arose controls).

In conclusion, the First Circuit has stated that the plan in place when benefits are first denied determines the standard of review, and that subsequent plan amendments during the administrative appeals process must be disregarded. Partners have failed to offer a strong reason to depart from that position. The SPD in effect at the time of the initial benefits decision did not grant any discretion to the plan. Thus, the Court shall apply a de novo standard of review.

B.  The De Novo Standard of Review

"[D]e novo review generally consists of the court's independent weighing of the facts and opinions" in the administrative record. Orndorf, 404 F.3d at 518. The Court owes no deference to the insurer's interpretations or conclusions. See Adele E. v. Anthem Blue Cross, 183 F. Supp. 3d 173, 181 (D. Me. 2016). In other words, the Court "stand[s] in the shoes of the administrator to determine whether the administrative decision was correct." Richards v. Hewlett–Packard Corp., 592 F.3d 232, 239 (1st Cir. 2010) (citation and internal quotation marks omitted). The plaintiff bears the burden of showing by a preponderance that they are entitled to the benefits they seek. See Orndorf, 404 F.3d at 518; Gent v. CUNA Mut. Ins. Soc'y, 611 F.3d 79, 83 (1st Cir. 2010). The First Circuit has indicated that under de novo review the terms of the governing insurance policy "must be strictly construed against the insurer and in favor of the insured." Stamp v. Metro. Life Ins. Co., 531 F.3d 84, 93 (1st Cir. 2008).

III.    DISCUSSION

Solari argues her LTD benefits must be reinstated because she is disabled under the terms of the governing policy. Partners responds that Solari's diagnoses are borderline or scant and argues she has sufficient residual capacity to engage in certain forms of sedentary employment, rendering her ineligible for LTD benefits. In considering these arguments, the Court initially puts to one side the results of Solari's Functional Capacity Evaluation, considering its impact only after examining the other record evidence.

A.  Medical Analysis

Notwithstanding Partners' arguments to the contrary, the record establishes Solari suffers from POTS and MCAS. In 2011, Solari underwent autonomic testing which revealed evidence of POTS. During tilt table testing, Solari's recorded heartrate was 107 beats per minute from a

17

baseline of 75. AR0763. During the active stand portion of the test, Solari's recorded heartrate was 116 beats per minute from a baseline of 78. Id. Her examining doctor concluded her response approached criteria for an exaggerated postural tachycardia during the tilt test exam and that Solari demonstrated exaggerated postural tachycardia during the active stand test. Solari's treating neurophysiologist, Dr. Hovaguimian, agreed these results were significant for POTS. Partners' non-examining physician, Dr. Kales, dismisses these results as "not clinically remarkable," AR2841, but made no effort to explain why he disagreed with the interpretation of Solari's examining physicians, who found that Solaris' results were significant for exaggerated postural tachycardia during the active stand portion of the exam. Indeed, Dr. Kale's discussion appears to only focus on the tilt table results (which all agree were borderline) and entirely overlooks the results from the active stand portion of the test (which were not). See id. (seemingly misattributing results from active stand portion of the test to tilt table portion of test). It is true Solari also had two borderline studies after her initial diagnosis. But these later tests were performed after Solari had begun treatment for POTS and the examining physician specifically noted that the results of this testing may have been influenced by Solari's prescription medications, specifically fexofenadine and ranitidine. AR2296.

The record similarly supports Dr. Greenberger's MCAS diagnosis. When Solari first presented to Dr. Greenberger, he noted she suffered from flushing, headaches, night sweats, forgetfulness, occasional abdominal pain, abdominal bloating and distention, inordinate fatigue, and alcohol intolerance, symptoms he described as being strongly associated with MCAS. AR0872. Although Solari's initial urinary analysis came back negative, Dr. Greenberger noted this was not uncommon for patients suffering from MCAS and confirmed his diagnosis after Solari responded strongly to treatment. AR0873–75; AR0879. It appears that Solari's primary

18

remaining symptom after beginning treatment with Dr. Greenberger was fatigue. AR1432; AR2491. It is true that in 2017, following a colonoscopy, Solari was found to have a normal distribution of mast cells. But as explained by Dr. Greenberger, "this may be a function of the fact that [Solari] has been on anti-mast cell treatment for at least a few years." AR2658. In his report, Dr. Kales discounted Dr. Greenberger's diagnosis, noting that he had been unable to discover any documentation of Solari's self-reported symptoms, such as fever, in her medical records. AR2842. The Court assumes Dr. Kales intended to say he found no <u>recent</u> evidence of Solari's symptoms, because Solari's early medical history amply document instances of fever, <u>see, e.g.</u>, AR0503 (confirming fever during exam); AR0543 (same), as well as many of her other reported symptoms. And as noted by Dr. Greenberger, the fact Solari's symptoms have reduced with treatment would appear to support, rather than undermine, his initial diagnosis.

Viewed as a whole, the objective evidence demonstrates Solari suffers from POTS and MCAS. But it is also apparent that these diseases are well controlled and do not fully account for Solari's primary complaint of fatigue. Treatment and dietary changes have addressed the majority of the symptoms caused by MCAS. AR2823. Recent testing has revealed scant evidence of POTS and Solari's treating physician, Dr. Hovaguimian, has opined that the severity of Solari's reported fatigue goes beyond what can reasonably be attributed to POTS. AR1637; <u>see also</u> AR2298 (Dr. Hovaguimian describing Solari's POTS as "mild").[8]

Nonetheless, Solari's complaints of fatigue are well documented in the record. <u>See, e.g.</u>, AR0872; AR0878; AR0927; AR1050. And these complaints are corroborated by the statements of Solari's friends and family who, as discussed above, universally report that Solari behaves in a

---

[8] What is more, Solari has not suffered episodes of syncope, nor have any restrictions been placed on her driving. AR2055.

manner consistent with someone who suffers from severe fatigue. The mere fact that Solari's reported fatigue is not susceptible to objective testing is not, in itself, sufficient to justify denying her LTD benefits. See Cook v. Liberty Life Assurance Co., 320 F.3d 11 (1st Cir.2003); see also Boardman v. Prudential Ins. Co. of Am., 337 F.3d 9, 16 n.5 (1st Cir. 2003) ("While . . . chronic fatigue . . . may not lend [itself] to objective clinical findings, the physical limitations imposed by the symptoms of such [an] illness[] do lend themselves to objective analysis."). And in any event, there is some objective evidence to suggest Solari is incapable of even the lightest of work. In 2014, Solari was enrolled in a cardiovascular rehabilitation clinic in which she regularly engaged in carefully monitored light exercise. The records from this clinic show that Solari was able to take part in only the most minimal of physical activity. After fifteen weeks of conditioning, Solari was able to exercise for forty minutes at a MET level of 2.8. AR1856. For reference, the activity of dressing and undressing is rated at 2.5 METs. See Barbara E. Ainsworth et al., 2011 Compendium of Physical Activities: A Second Update of Codes and MET Values, 43 Med. & Sci. in Sports & Exercise 1575, 1575–81 (2011). Even this light activity required significant exertion on the part of Solari, whose heartrate rose to over 130 beats per minute during the training period. AR1856.[9]

Of course, while fatigue is not easily established based on objective medical testing, the extent of the fatigue remains Solari's burden to establish. Assuming the record demonstrates that Solari suffers from fatigue, even if the severity of her fatigue is not fully explained by her medical diagnoses, the question remains whether Solari's fatigue is sufficiently severe as to

---

[9] In its final denial letter, Partners suggested that Solari's fatigue may be due to her deconditioning and weight gain. AR0372. But this argument appears misplaced in the absence of malingering (of which there is no evidence here). The governing plan defines "Disabled" by reference to a claimant's ability or inability to work—the cause of that inability is seemingly immaterial.

render her disabled within the meaning of the governing plan. Here, the evidence is mixed. Solari herself reports that she is able to engage in light activities on a fairly regular basis. She is the primary caregiver for her young children. AR2297; AR2518. She drives her children to school each day but must then rest on the couch. AR1476. She takes her dog on walks. AR2517. Solari often cooks for her family, AR0367, makes their beds, AR1476, takes care of the cleaning, AR1354, and does the laundry, id. Solari also reports that she volunteers semi-regularly at her children's school for an hour or two each week, but that there are occasionally days when she is unable to meet this obligation due to her fatigue. AR1574. None of these activities are necessarily inconsistent with Solari's self-reported fatigue or the objective evidence supporting these reports. But these activities also reveal that Solari is able to engage in light activity which may well qualify her for sedentary employment.

All told, the objective medical evidence establishes that Solari suffers from POTS and MCAS, that the most severe symptoms of these diseases are well controlled, and that Solari nonetheless continues to report potentially debilitating fatigue and deconditioning. Although Solari's treating physicians are unable to explain the severity of Solari's fatigue solely by reference to her diagnosed conditions, they find her reported levels of fatigue to be facially plausible in light of her medical history and have supported her claims for LTD benefits. AR0193; AR0213; AR0214. Moreover, objective medical evidence documents Solari's inability to do anything but the lightest of physical activity. Nonetheless, Solari admits she is able to engage in light household work as the primary caregiver of her children and the record reflects she maintains a level of activity in her personal life seemingly consistent with employment in a sedentary occupation. Of course, the ultimate burden of proof lies with Solari. But the Court

need not yet consider whether she has carried this burden as one further item of evidence remains for consideration.

B.   The Functional Capacity Evaluation

In support of her final appeal to Partners, Solari submitted the results of a Functional Capacity Evaluation conducted by an occupational therapist. AR0311. During the second day of the FCE study, the occupational therapist reports Solari exhibited symptoms of a serious medical event. While completing a simple seated exercise, Solari's heartrate suddenly doubled, increasing from 90 beats per minute to 180 beats per minute. AR0313. Solari quickly lay down and, after two minutes of lying on the floor, Solari's heartrate began to fall, reaching 150 to 170 beats per minute. Id. Solari then began to experience profound fatigue, chattering teeth, and tremors. Id. After forty-five minutes of lying prone, Solari was able to walk to the bathroom with assistance. Id. She then reported to the occupational therapist that this reaction to sedentary activity can happen multiple times per week. Id. There is no doubt that the measurements of Solari's heart rate by a medical professional and the observation of her physical symptoms, again by a medical professional, are "objective" medical evidence.

Partners has made no effort to address or explain the FCE results. Partners' reviewing physician, Dr. Kales, did not mention the FCE test once in his evaluation of Solari's case. See generally AR2840. Indeed, Dr. Kales's conclusions largely rest on the lack of objective evidence documenting Solari's medical conditions—a seemingly untenable position (without further explanation) given the FCE results. AR2841 (Dr. Kales citing "insufficient objective medical . . . to support the restrictions and limitations that have been claimed"); see also AR2842 (Dr. Kales relying on lack of documentation of evidence of anaphylaxis and tachycardia). Following Dr. Kales's lead, Partners also ignored the FCE report in its final decision letter. AR0371. And

Partners only discusses the FCE in its briefs in passing, without making any effort to explain its bearing on the ultimate question of disability. Doc. No. 37 at 9.

Indeed, Partners' treatment of the FCE results in briefing serves to highlight the problems with Dr. Kales' report and with Partners' final decision. Partners only discusses the FCE results in response to Solari's argument that it failed to consider this evidence during the administrative appeal process. Partners insists it considered the FCE results, pointing to its own representations, in its denial letter, that it considered the entire record in making its decision. Doc. No. 37 at 9. Less tautologically, Partners also argues that Dr. Kales's report, on its behalf, implicitly addressed the FCE because Dr. Kales responded to a letter from Dr. Ehrlich, dated January 17, 2019, which largely relied upon the FCE results. Id. It is true that Dr. Ehrlich's letter relied on the FCE, stating: "During [FCE] testing, [Solari's] HR went up to 180 due to her POTS, Mast cell disease and autonomic instability requiring that she lie down on the floor and felt ill." AR0357. But Dr. Kales's report did not so much as acknowledge Dr. Ehrlich's observation. His entire response to Dr. Ehrlich's letter reads:

> Dr. Ehrlich's letter of January 17, 2019 argues that the claimant is disabled by severe fatigue (this is subjective, also see comments above on fatigue), hypotension (see above- not documented in the records provided) and "cognitive difficulties" (also never documented).

AR 2844.

The use of the word "argues" perhaps reveals more about Dr. Kales's report than it does about the nature of Dr. Ehrlich's January 17, 2019 letter. Arguments are the stuff of lawyers; in the Court's view Dr. Ehrlich simply evaluated objective medical evidence—Solari's heart rate spiking to 180 beats per minute during the FCE—and rendered a medical opinion that this spike was "due to her POTS, Mast cell disease and autonomic instability." AR0357. Dr. Kales was engaged to provide an independent medical review. Yet, Dr. Kales's review never mentions the

FCE, notes repeatedly the lack of "objective" evidence, and dismisses Dr. Ehrlich's letter as mere argument unsupported by medical documentation. In conclusion, Partners' claim it considered the FCE results in reaching its decision appears to be unsupported by the record.

In evaluating Solari's claim for benefits, the Court is not free to ignore the FCE evidence or the opinion of Dr. Ehrlich based on that evidence. These unrebutted, unaddressed, and seemingly unconsidered sources of evidence undermine some (though not all) of the opinions and conclusions advanced by Partners. More to the point, the nature of the attack Solari experienced during the FCE appears to bear on the ultimate question of disability. For this reason, to determine whether Solari has met her burden of proof to establish disability, the Court must evaluate not only the significance of the FCE, but also all of the medical evidence and opinions in the record to which it relates. Because much of the briefing by the parties, understandably, focused on other important procedural and legal issues in the case, the Court hereby ORDERS the parties to provide supplemental briefing in the form of a joint status report. Each party shall have up to seven pages within the report to discuss the significance of the FCE, as it bears on the ultimate merits question in relation to the remainder of the record, as well as whether Solari has met her burden of proof based on the evidence in the record. The Court has carefully considered all other arguments advanced by the parties in briefing to date and reserves on any arguments not otherwise addressed by this decision. All previously raised arguments are preserved, there is no need to reiterate or reemphasize such arguments in the status report. The parties shall file the joint status report within fourteen days.

IV.    <u>CONCLUSION</u>

For the foregoing reasons, Solari's Motion for Summary Judgment (<u>Doc. No. 34</u>) and Partners' Cross Motion for Summary Judgment (<u>Doc. No. 39</u>) are ALLOWED IN PART, DENIED IN PART, and RESERVED IN PART as detailed herein.

SO ORDERED.

<u>  /s/ Leo T. Sorokin                    </u>
Leo T. Sorokin
United States District Judge